IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 25-2558-SMD |
| | ) | |
| vs. | ) | |
| | ) | |
| GREGORY VANDENBERG, | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' RESPONSE TO MOTION TO REVOKE DETENTION ORDER**

The United States hereby responds to Defendant's Motion for Revocation of Detention Order (Doc. 51). As discussed below, Defendant is a danger to the community and a flight risk, and there are no conditions that will reasonably assure the safety of the community or Defendant's appearance at future court proceedings. The Court should therefore deny Defendant's motion.

**I.   BACKGROUND**

On a Thursday afternoon on June 12, 2025, Defendant went to Bowlin's Continental Divide Trading Post, located by an I-10 exit near Lordsburg, New Mexico, to purchase fireworks.[1] While there, he requested assistance from the cashier, J.R., in selecting fireworks. According to a preliminary interview of J.R., conducted via phone later in the day on June 12, 2025, *see* Gov't Ex. 1, Defendant began inquiring about the biggest explosives that the store sold. Defendant then mentioned that he was seeking fireworks that could be thrown directly at people to cause harm. He also stated that he was prior special forces military and could make pipe bombs. He also informed J.R. that he was traveling to the riots in California to harm law enforcement officers or government officials. Defendant mentioned that he had just been in the San Diego, California,

---

[1] Unless otherwise noted, the facts set forth in this section are taken from Government Exhibits 1–3, which are the FBI's reports of the three separate interviews given by J.R.

riots, and he invited J.R. to come with him and to meet with his platoon in California for the riots. Defendant also told J.R. that he had 80-year-old mortar explosives in his vehicle that he was planning on using at the riots to harm officers.

### A.  Defendant's Specific Statements About Using Fireworks at the Protests

The FBI conducted two subsequent interviews of J.R., one on July 16, 2025, and one on July 31, 2025.  *See* Gov't Ex. 2–3.  During these interviews, J.R. provided further clarifying details as to the interaction he had with Defendant.  J.R. clarified that, although Defendant never expressly stated that he was going to "kill" anyone, he unequivocally implied that he at least intended to intimidate, if not harm, others—particularly by repeatedly expressing an intent to throw dangerous fireworks into the crowd at police officers during the protests.

During these two interviews, J.R. stated that Defendant first asked whether the store sold M-80 fireworks, which are illegal.  During their initial discussion about fireworks, Defendant mentioned that he was prior special forces military and even knew how to make "pipe bombs" out of the military's MRE ("Meal, Ready-to-Eat") individual meal packages.  He also mentioned that he had 80-year-old military mortar rounds—with an accompanying "mortar launcher"—that he and his platoon obtained from the military.  J.R. further clarified that, although Defendant did not expressly state that he would try to kill or harm anyone with these military-grade weapons, Defendant implied that he could easily access these mortar rounds and launcher if he wanted to. Defendant also informed J.R. that he would be traveling to California for the upcoming riots— which J.R. assumed to be the "No Kings Day" protests, which were scheduled for Saturday, June 14, 2025, and which seemed to be common knowledge.[2]

---

[2] Defendant also stated that he planned on meeting someone there.  When J.R. declined to go with him to the riots, Defendant also asked why—given that J.R. was "brown"—he was not mad and not going to the riots.

In discussing the fireworks that Defendant was thinking of purchasing, J.R. stated that Defendant made a number of extremely concerning comments, something to the effect of:

    a. "If I wanted to hurt people, which fireworks could I use?"

    b. "I can throw them [meaning Patriot mortar round fireworks] into the crowd at the cops."

    c. In response to J.R.'s recommendation that Defendant not do that because he could get hurt, Defendant stated, "I'm not going to get hurt; I know what I'm doing."

    d. "I can tape two or three of them [meaning Patriot mortar round fireworks] together and light them and throw them into the crowd at the cops."

    e. In response to J.R. stating something like "I wouldn't do that," Defendant stated something like, "well, what *if* I wanted to do it?" J.R. assumed that Defendant realized that J.R. was getting concerned and thus began using more "what if" statements—such as "what if" he threw certain fireworks into a crowd.

    f. "I don't want to spend $150 on these [mortar round fireworks], when I can have more of the smaller boxes for cheaper if I'm just going to throw them."

    g. "So if I get six boxes [of the Black Cat mortar round fireworks], I can hand them out to other people."

    h. "So if I use these, will these make a big explosion?" "Which one has the biggest explosion that is bare, with no color or extra effects?"

    i. "I can either throw these [mortar round fireworks] or put them into the canister and shoot them." In making this comment, as well as with some other comments, Defendant seemed to be partially "thinking out loud" to himself – but also aware that J.R. was listening to him.

During this discussion, Defendant also conveyed that he wanted to purchase the biggest explosive for the cheapest price. He further conveyed that he did not care about the color, display pattern,

or looks of the fireworks.  As noted, he conveyed that he wanted to—or was at least considering—combining two or three mortar fireworks together, taping them, and then throwing the combined fireworks into the crowd of riot police to make a bigger explosion.  While looking at the fireworks, he often asked how many grams of gun powder each firework contained.  He also asked about the details of the various types of mortar firework explosions, such as whether the explosion would be circular, and which mortar firework would have the widest explosive spread.  Defendant initially expressed interest in purchasing six boxes of six mortar rounds each, and he asked if a discount was an option.  But he ultimately chose not to buy those boxes and suggested that they were too expensive for him.  During this conversation, Defendant expressed negative comments about police and, according to J.R., seemed to be generally angry and anti-government.



*(Defendant and J.R. at Bowlin's on June 12, 2025)*

### B.  Defendant's Purchase of Fireworks

The store manager overheard J.R. state that it would not be safe to throw fireworks at people, so she went to the register to provide support.[3]  When Defendant went to the register to purchase fireworks, he showed her his U.S. military identification—but stated that he was "foreign military" and refused to let go of his identification, asking the manager if she wanted to trace it. Defendant then purchased six mortar fireworks (Black Cat 5-inch firework shells), which hold 60 grams of gun powder each, and 72 smaller fireworks (Black Cat M-150 Salute fireworks, one package of 36 and three packages of 12).[4]  After Defendant made his purchase, the manager and J.R. discussed the incident some more and decided that they needed to contact law enforcement. Consequently, the manager and J.R. went to the parking lot and obtained the (Montana) license plate information from Defendant's 2024 Ford Bronco and called law enforcement.  They then observed Defendant drive away and head west on I-10.

### C.  Defendant's Arrest and Additional Statements

Law enforcement officials tracked Defendant and arrested him early the next morning at the Davis-Monthan Air Force Base in Tucson, Arizona, while he was sleeping in his car in the parking lot of the on-base lodging facility.  Pursuant to a federal search warrant, signed by a federal magistrate judge in Arizona, agents searched Defendant's vehicle on June 13, 2025.  In addition to the fireworks that Defendant purchased, agents found, among other things, concerning items of

---

[3] While J.R. was away from Defendant, J.R. spoke to the manager to ask if they should sell the fireworks to Defendant in light of the concerning statements he had made.  J.R. was so disturbed by what Defendant was stating, that J.R. told the manager that he refused to sell fireworks to Defendant.  *See also* Gov't Ex. 4 (report of interview of store manager).  The store manager called her supervisor, who told her to take charge and that it was up to her discretion as to whether to sell the fireworks to this individual.  *Id.*

[4] The maximum amount of gun powder allowed in a mortar firework is 60 grams.  *See, e.g.,* Mark's Fireworks – Pro Talk: Artillery Shells Explained, https://marksfireworks.com/pro-talk-artillery-shells-explained/#; Mean Gene Fireworks – FAQ, https://meangenefireworks.com/faq/#.

clothing—some of which included antisemitic references (e.g., a t-shirt with a reference to a possible conspiracy theory about Israel's accidental attack on the USS Liberty in 1967 and another t-shirt stating "ivdea delenda est," a Latin phrase that roughly translates to "Judaea must be destroyed").[5]  In addition, agents found a t-shirt with an image of the Black Sun symbol, which is commonly associated with Neo-Nazism; a t-shirt and a hat that both contained images of the Al-Qaeda flag.






*(Selected Items Found in Defendant's Vehicle on June 13, 2025)*

---

[5] The t-shirt that Defendant was wearing on June 12, 2025, at Bowlin's and that was found in his car the next day (and which is partially shown in the bottom right photo above) contains the name "AMALEK"—a name that "has been invoked throughout history in reference to the enemies of the Jewish people." Jeffrey, D. and Levin, J., *Anti-Semitism, Amalek, and the American University*, Christian Scholar's Review (Aug. 25, 2024).

During a post-arrest, post-Miranda interview of Defendant by the FBI on June 13, 2025, Defendant claimed that he never intended to harm anyone and that his statements were simply misconstrued.  Gov't Ex. 5 (audio recording of Defendant's interview).  Specifically, he claimed that he stopped at the Bowlin's store to go to the bathroom and then had a conversation with the "Hispanic" salesman as they were scanning the bar codes of various fireworks and then watching a screen in the store that displayed a corresponding video of the what the scanned fireworks looked like as they are being set off.  *Id.*  Defendant stated to the FBI that he had seen some news videos earlier the previous morning (June 12, 2025) at his hotel in El Paso, Texas, of the protests in Los Angeles, California.  *Id.*[6]  He then stated that during this conversation with the salesman as they were watching the screen, he simply said something like, "Wait a minute, that's the shit that they use at the riots, all the like Antifa[7] and whatever the fuck that is?  Wait, are they throwing [fireworks like this]—oh, that's gay."  *Id.*  He stated that he simply bought the fireworks because "Fourth of July [was] coming up."  *Id.*

When he was being transported to jail after his arrest, Defendant stated that he was going to find the store employees—the "skinny meth head lady, 'Karen' the fat bitch" and "the fat Mexican guy"—and confront them for "ruining [his] life."  Gov't Ex. 7.  He later clarified that he would only confront these employees "in a peaceful manner."  *Id.*  Nevertheless, the law

---

[6] When asked what hotel he stayed at, specifically whether he stayed on Fort Bliss or not, Defendant stated, "I don't know; I don't remember."  *Id.*  (A receipt found in Defendant's car, however, shows that he spent the nights of June 10th and June 11th, 2025, on Fort Bliss, specifically at the Holiday Inn Express Guesthouse, 1744 Victory Avenue Fort Bliss, Texas.  *See* Gov't Ex. 6 (selected photos from search of vehicle).)

[7] Antifa "refers to a decentralized network of far-left militants that oppose what they believe are fascist, racist, or otherwise right-wing extremists." Jones, Seth G., *Who Are Antifa, and Are They a Threat?*, Center for Strategic International Studies (Jun. 4, 2020).  "Antifa groups frequently conduct counter-protests to disrupt far-right gatherings and rallies" and have been known to "use improvised explosive devices and other homemade weapons."  *Id.*

enforcement officials who transported him stated that he repeated this idea "numerous times in further conversation, in a threatening nature." *Id.* He was also upset that the federal magistrate judge in the District of Arizona did not set his initial appearance until Monday (as he was arrested Friday morning). He stated that when "[he] get[s] out of [custody], [he is] going to find that judge and go to his house." *Id.*

### D. Defendant's False Statements About His Travel Plans

Regarding his travel plans, Defendant stated to the FBI that he didn't "even fucking want to go to California; we're[8] hanging out here, and we're going to, uh, north; we're going to visit some friends in Phoenix, and that's it." Gov't Ex. 5. Such a travel plan, however, was inconsistent with a number of other statements by Defendant. First, Defendant stated to J.R. the previous day (June 12, 2025) that he was travelling to California to attend the riots. *See* Gov't Ex. 1–2. Second, Defendant stated on June 10, 2025, to an individual on Fort Bliss (whom he was talking to after his Ford Bronco was involved in a minor "fender bender") that he was travelling to California for work—and expressed his concern that he might not make it to California in time. Gov't Ex. 8. In addition, pursuant to a federal search warrant signed by a federal magistrate judge in Arizona, agents searched Defendant's iPhone. During this search, agents discovered a text message from Defendant at around 10:30 a.m. on June 11, 2025, to this same individual at Fort Bliss. Gov't Ex. 9. In his text, Defendant stated that he "need[ed] to be in Phoenix today [June 11, 2025] And [sic] San Diego tomorrow." *Id.* In addition, Defendant also texted his friend, Erick Lopez, right around this same time to inform him about the "fender bender" incident. *Id.* In his text, Defendant mentioned that he stated to the people at the scene that he was "on the way to San Diego." *Id.*

---

[8] Defendant, who is originally from Poland and speaks with a Polish accent, clarified earlier in the conversation that "we" only referred to one person: himself. *Id.*

Defendant also advised Pretrial Services that "he currently has no permanent residence as he has been traveling for work purposes."  Doc. 14-1 at 2.  He also stated that "he was coming from Texas and traveling to Flagstaff and the Grand Canyon."  *Id.* "He indicated, prior to his current travel to Arizona, he had been in Texas for two weeks, again in Arizona, in Montana, in Arizona, and in New York for one month."  *Id.*

### E.  Additional Evidence of Defendant's Motivation

Defendant's phone contains additional evidence that Defendant (1) appears interested in a violent fundamentalist Islamic ideology, which by its nature is opposed to the United States government (as such ideologies believe that the United States is "the root of all evil" due to, among other things, its support of Israel);[9] and (2) had an anti-Trump knowledge, motive, and intent as he was travelling on June 12, 2025, with fireworks to the anti-Trump ("No Kings Day") protests in San Diego, California, scheduled for June 14, 2025.[10]

For example, Defendant's phone contains the following: (a) a video of a young child decapitating a teddy bear in front of an ISIS flag and then chanting the Takbir (i.e., the Arabic phrase of "Allāhu ʾAkbar"); (b) numerous—and violent—antisemitic references; (c) violent anti-Christian references; (d) items that suggest an obsession with violence (such as a decapitation of a female and other forms of live executions of real people); (e) items that suggest an affinity for

---

[9] *See, e.g.,* Zeidan, D., *The Islamic Fundamentalist View of Life as a Perennial Battle*, MIDDLE EAST REVIEW OF INTERNATIONAL AFFAIRS, Vol. 5, No. 4 (Dec. 2001) (observing that, in "contemporary Islamic fundamentalism," (1) "anti-Semitic rhetoric plays a dominant role" and (2) "the United States [is viewed] as the main enemy of Islam"—as it is seen as "the root of all evil and corruption," including for its "sins of supporting Israel against the Palestinians").

[10] *See* Aere, J., *60,000+ March Through Downtown [San Diego] for 'No Kings' Protest*, KPBS NEWS – POLITICS (Jun. 14, 2025), www.kpbs.org/news/politics/2025/06/14/thousands-march-through-downtown-for-no-kings-day-protest (observing that "[a]bout 60,000 people took to the streets of downtown San Diego on Saturday for what organizers [had] call[ed] 'No Kings' Day, a nationwide protest of President Donald Trump's policies coinciding with a military parade in the nation's capital" and that such protests were designed to address what many citizens viewed as the "cruelty and the corruption and the authoritarianism of the Trump regime").

violent extremist Islamic fundamentalist ideology; and (f) items that suggest an opposition to the United States government, including the current administration (such as a video, which Defendant shared with a friend on May 24, 2025, showing President Donald Trump, in a dubbed over voice, stating "May Allah awaken the people and help them see the evil doings of Israel and the United States."). *See* Gov't Ex. 9.

In light of the evidence discussed in the sections above, Defendant has been indicted on one count of violating 18 U.S.C. § 844(d), which makes it a crime to "transport or receive, in interstate or foreign commerce any explosive with the knowledge or intent that it will be used to kill, injure, or intimidate any individual." 18 U.S.C. § 844(d); *see* Doc. 20 (Indictment).

## II.  THREAT TO COMMIT MURDER

On November 27, 2022, Defendant made a terroristic threat to a bartender at the Wynn Las Vegas hotel. *See* Gov't Ex. 10. Specifically, Defendant told this bartender that "I need you to know where I am from, when I murder everyone like Mandalay Bay." The Mandalay Bay statement appears to refer to the 2017 mass shooting from the Mandalay Bay hotel in Las Vegas— the "deadliest mass shooting in modern American history." *See, e.g.,* Kovaleski, S., & Oppel, R., *A Man Stashed Guns in His Las Vegas Hotel Room. 3 Years Later, a Killer Did the Same*, NY TIMES (Sept. 28, 2018) (observing that in 2017 "Stephen Paddock used a suite on the 32nd floor of the Mandalay Bay to stock an array of guns and carry out the deadliest mass shooting in modern American history, killing 58 people and injuring hundreds of others at a country music festival").

In light of this threat, Defendant was arrested and eventually charged with trespassing. *See* Gov't Ex. 10; *see also* Gov't Ex. 11 (referencing the federal investigation prompted by this threat); Gov't Ex. 12 (Chief Petty Officer Bentley, who went through training with Vandenberg,

commenting that he "[was] not surprised that something like this would happen to Vandenberg" and explaining how Vandenberg "did not seem to be in the right [state] of mind"); Gov't Ex. 13 (showing Vandenberg was arrested in 2014 for punching a random stranger—who had no previous interactions with Vandenberg—while that individual was unloading items from the back of his car).

## III.  DETENTION ORDER

At the detention hearing in the District of Arizona (Tucson) on June 16, 2025, United States Magistrate Judge James E. Marner found there "[was] probable cause to believe that the defendant has committed an offense."  Doc. 17 at 2.  In addition, Judge Marner concluded: (1) by "[c]lear and convincing evidence that the defendant is a danger to the community, that no condition or combination of release conditions will reasonably assure the safety of the community and require the detention of the defendant pending trial"; and (2) by "[a] preponderance of the evidence that the defendant is a serious flight risk, that no condition or combination of release conditions will reasonably assure the defendant's appearance and require the detention of the defendant pending trial."  Doc. 17 at 2.

In making these findings, Judge Marner expressly noted that "[t]he reports and recommendation from [the] Pretrial Services Agency [were] adopted as [his] further findings."  *Id.* The Pretrial Service Agency made the following findings regarding Defendant's history, residence, and family ties:

> [Defendant] advised he currently has no permanent residence as he has been traveling for work purposes but has a residence in Montana where he rents a room with other roommates.[11]  He initially indicated he had been in Flagstaff, Arizona

---

[11] The FBI was unable to find any residential or apartment address in Montana associated with Defendant— or any individuals who were roommates with Defendant in Montana.  The only Montana address that the FBI could find that is associated with Defendant is a private mailbox at a UPS Store in Bozeman, Montana. Defendant appears to have been essentially living out of his vehicle (often on military installations) while renting a storage unit in the Phoenix area.

for approximately two weeks visiting a friend and later indicated he was "car camping" in Tucson as he was coming from Texas and traveling to Flagstaff and the Grand Canyon. He indicated, prior to his current travel to Arizona, he had been in Texas for two weeks, again in Arizona, in Montana, in Arizona, and in New York for one month. He reported he has lived in several states within the United States as well as several countries abroad due to his military history. He indicated if he is released, he could reside with a friend in Phoenix, but he was unable to provide his friend's complete name or address.

The defendant reported he had one sister who died recently and added both parents are now deceased. He stated he has no living immediate family. The defendant advised he is unmarried, has no children, and is not currently involved in a relationship.

Doc. 10 (25mj8025-JEM, D. Ariz.) at 2. Regarding Defendant's employment, Pretrial Services noted the following:

[Defendant] reported he is one hundred percent disabled due to his military service and has been receiving his disability benefits through the Veteran Affairs since 2014. He indicated he is currently self-employed as a private contractor doing military trainings. He reported he served in the United States Navy as a Navy Seal[12] from 2004 to 2014 and received an Honorable Discharge. He claimed he received a disciplinary action due to a DUI and lost rank as his punishment.

*Id.* Defendant "stated his monthly income includes $4,800 he earns from his self-employment and his disability benefits." *Id.* at 2–3.[13] He also "note[d] he has suffered from several traumatic brain injuries as a result of his military history." *Id.* at 3. In addition, he "reported he was diagnosed with post-traumatic stress disorder, anxiety, and depression in 2015 and received therapy for a few months before stopping and was prescribed medication which he has taken intermittently since

---

[12] The U.S. Navy SEALs (short for "Sea, Air, and Land" Teams) were "[e]stablished by President John F. Kennedy in 1962" and are considered "a nimble, elite maritime military force suited for all aspects of unconventional warfare." U.S. Navy – Navy SEAL: Career Details & Requirements, www.navy.com/careers-benefits/careers/special-operations/navy-seal.

[13] A veteran who is 100 percent disabled and who has no dependent spouse, children, or parents currently receives $3,831.30 in monthly disability compensation. *See* U.S. Department of Veteran Affairs – Current Veterans Disability Compensation Rates, www.va.gov/disability/compensation-rates/veteran-rates.

then." *Id.* Records from California note that Defendant "is court-ordered to use an ignition interlock device, and his driver license status is listed as suspended or revoked." *Id.* at 4.[14]

Pretrial Services found that Defendant poses both a risk of nonappearance and a danger to the community:

> Assessment of Nonappearance:
>
> [D]efendant poses a risk of nonappearance based on his lack of stable residence, his tenuous employment situation, his criminal history, his lack of ties to the District of Arizona, his possession of a United States passport, his substance abuse history as noted by his criminal history, his possible status on probation supervision based on a recent conviction for a DUI offense,[15] his continued involvement in criminal behavior, and his mental health history. Additionally, Pretrial Services is concerned regarding the nature of the alleged offense.
>
> Assessment of Danger:
>
> [D]efendant poses a risk of danger to the community based on his substance use history as noted by his criminal history, his criminal history including a prior arrest for violent behavior, his possible status on probation supervision based on a recent conviction for a DUI offense, his continued involvement in criminal behavior, and his mental health history. Additionally, Pretrial Services is concerned regarding the nature of the alleged offense.

*Id.* at 4–5. Ultimately, Pretrial Services found that there were "no conditions or combination of conditions to reasonably assure either the defendant's appearance in court or the safety of the community" and thus "recommend[ed] the defendant be detained." *Id.* at 5.

## IV. MOTION TO REVOKE

Defendant requests that the Court release him to the "Morris House," some sort of facility in Las Cruces, New Mexico, that "provides a structured home for people, including veterans, who

---

[14] When Defendant was arrested, he was found with some older (and expired) New York driver's licenses that belonged to him—but a recent California driver's license (which was not expired) that did not belong to him (and instead belonged to a white male who was born in 1990). *See* Gov't Ex. 14.

[15] A report provided to the FBI by the National Crime Information Center states that Defendant was sentenced to five years of probation in 2023 for a DUI offense in San Diego, California. *See* Gov't Ex. 16.

might require assistance with daily living." Doc. 51 at 11–12.  In support of this request, Defendant essentially contends that (1) the "nature and circumstances of the offense" involve only a small amount of fireworks and "flimsy" evidence; *id.* at 8–11; (2) the "weight of the evidence" shows "the government has no credible evidence whatsoever to support the assertion that [he] was transporting the fireworks to LA to hurt police or citizens at the riots," *id.* at 9–10; (3) the "nature and characteristics" of Defendant "favor his release," *id.* at 10–11; and (4) Defendant poses "no serious danger to any person," *id.* at 11–12.

As explained below, a proper consideration of the § 3142(g) factors establishes that no set of conditions will reasonably assure Defendant's appearance as required or the safety of the community.

## V.   APPLICABLE LEGAL STANDARDS

### A.  Standard of Review

"The standard of review for a magistrate judge's detention or release order under § 3145(a) is de novo."  *United States v. Cisneros*, 328 F.3d 610, 616 n.1 (10th Cir. 2003); *see also United States v. Campas,* No. 24-4003, 2024 U.S. App. LEXIS 3822, at *7 (10th Cir. Feb. 20, 2024) (same).[16]

### B.  Pretrial Detention

"The Bail Reform Act, 18 U.S.C. § 3142, sets out the framework for evaluating whether pretrial detention is appropriate."  *Id.* at *5.  Under this statute, "a defendant must be detained pending trial if a judicial officer finds that 'no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and

---

[16] "A detention order must include 'written findings of fact and a written statement of the reasons for the detention,' but a reviewing district court can state its reasons for detention 'in writing, or orally on the record.'"  *Id.* at *6–7 (first quoting 18 U.S.C. § 3142(i), then quoting Fed. R. App. P. 9(a)).

the community.'" *United States v. Ramos-Caballero*, No. 21-2098, 2021 U.S. App. LEXIS 33131, at *4 (10th Cir. Nov. 8, 2021) (quoting 18 U.S.C. § 3142(e)(1)).  "A judicial officer may make such a finding only after holding a hearing," and "the government bears the burden of proof at that hearing."  *Cisneros*, 328 F.3d at 616.  In addition, "[t]he government must prove risk of flight by a preponderance of the evidence, and it must prove dangerousness to any other person or to the community by clear and convincing evidence."  *Id.* (citations omitted).

"'In determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community,' the judicial officer must consider" four factors:

> (1) "the nature and circumstances of the offense charged"; (2) "the weight of the evidence against the person"; (3) "the history and characteristics of the person";[17] and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

*Id.* at 617 (quoting 18 U.S.C. § 3142(g)).

## VI.  DISCUSSION

A consideration of the relevant factors under 18 U.S.C. § 3142(g) establishes that Defendant is a danger to the community and a flight risk and that "no condition or combination of conditions will reasonably assure the appearance of [Defendant] as required and the safety of . . . the community."  18 U.S.C. § 3142(e)(1).  Consequently, the Court should "order the detention of [Defendant] before trial."  *Id.*

---

[17] This factor includes, *inter alia*, "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings."  18 U.S.C. § 3142(g)(3).

## A.  Nature and Circumstances of the Offense and Weight of the Evidence

The "nature and circumstances of the offense" and "weight of the evidence," 18 U.S.C. § 3142(g)(1)–(2), weigh heavily against release, as they show Defendant is a flight risk and a danger to the community.

Defendant has been indicted on a serious felony charge, a violation of 18 U.S.C. § 844(d), which carries a maximum penalty of up to ten years of imprisonment.  To be clear, Defendant—a former U.S. Navy SEAL—does not appear to have been planning a "murderous rampage," Doc. 51 at 9, with six mortar fireworks and 72 firecrackers at an anti-Trump protest.  Nevertheless, the evidence establishes that he intended to use these fireworks in an unlawful manner at the June 14, 2025, anti-Trump ("No Kings Day") protests in San Diego, California.  Specifically, the evidence shows that he intended to use those fireworks to intimidate others at this protest, such as by throwing the fireworks at or near crowds of people, including law enforcement officials.  *See, e.g.,* Gov't Exs. 1–9.  The evidence further shows that he had little regard for whether or not such individuals would be injured by these fireworks.  *See, e.g.,* Gov't Ex. 1–3; *see also* 18 U.S.C. § 844(d) (prohibiting the possession or transportation of certain explosives, including fireworks that have moved in interstate or foreign commerce, with the intent that they be used to "intimidate" or "injure" "any individual").

It almost goes without saying that it is not a crime to oppose the policies of the government, to possess normal consumer fireworks, or to attend a political protest.  But when an individual chooses to act on his opposition to the government by resorting to intimidation or violence— particularly by throwing fireworks at or near crowds of people at a protest—the line between legal and illegal has been crossed.  *See* 18 U.S.C. § 844(d).  Such actions pose a very real danger to others and the community.  Such actions are even more concerning in light of Defendant's apparent

interest in a violent fundamentalist Islamic ideology, *see* Gov't Exs. 6, 9, as well as his history and characteristics, which are addressed below.

The weight of the evidence in this case is strong. Defendant expressed his intent to throw fireworks at the upcoming protests numerous times to the store clerk—who refused to sell him fireworks because he was so concerned about Defendant's intentions. The store clerk immediately repeated this information to his manager, who then called her boss to ask for advice. Shortly after the manager sold the fireworks (a decision she almost instantly regretted), she and the store clerk called law enforcement to inform them about Defendant's intent. *See* Gov't Ex. 15 (call by clerk to law enforcement).

Aside from the clerk's statements—and Vandenberg's purchase of the fireworks and traveling towards California—there is also the additional evidence that Vandenberg lied to the FBI about where he was going when he was arrested the next day. He told the clerk, two people in El Paso, and his friend that he was headed to San Diego. But immediately after he was arrested, he then claimed that he was simply visiting "friends" in Phoenix (and then later claimed that he was going to Flagstaff and the Grand Canyon). In addition, the items found in Defendant's vehicle and on his phone provide strong evidence of Defendant's motive and intent. Specifically, this evidence shows that Defendant wanted to attend the anti-Trump protest and throw fireworks because he has anti-Trump views—views which were motivated at least in part by his interest in a violent fundamentalist Islamic ideology. In light of the strength of the evidence and potentially lengthy term of imprisonment Defendant faces if convicted, he has a strong incentive to disobey any conditions of release and to not appear for future court proceedings.

In sum, the nature and circumstances of the offense and the weight of the evidence counsel strongly against Defendant's release.

**B. Defendant's History and Characteristics and Danger Posed to the Community**

The "history and characteristics of [Defendant]," as well as the "seriousness of the danger" he poses to the community, weigh strongly in favor of detention. 18 U.S.C. § 3142(g)(3)—(4). Defendant lacks a stable residence and stable employment, which are significant risk factors to being a flight risk. In addition, Defendant has trouble following court orders. For instance, he appears to have violated his probation in California by committing the instant offense—and also by driving with a suspended or revoked license, driving without an ignition interlock device, and driving with a California license that did not belong to him. *See* Doc. 14-1 (PTS Report) at 4; *su*pra notes 14–15; *see also* Doc. 14-1 at 2 (noting that, during his time in the military, Defendant violated military rules and the law when he "received a disciplinary action due to a DUI and lost rank as his punishment").

Aside from purchasing fireworks in New Mexico, Defendant appears to have no other ties to this district. Admittedly, Defendant does not necessarily have a financial need to work (due to his disability payments), and he naturally has the freedom to live a "car camper" lifestyle the rest of his life. But the government's concern with this lack of stability—combined with his mental health issues (which the government has not seen evidence that he is receiving consistent treatment for)—is that Defendant appears to be a sort of "lone wolf" who is susceptible to radicalization by a violent ideology. Such instability—especially of a former U.S. Navy SEAL who has received extensive training on how to kill people—poses a very real threat to our community. In addition to this instability, additional evidence of Defendant's danger to the community includes (1) his threat in 2022 to commit a "Mandalay Bay-style" mass murder; (2) his random assault of a stranger in 2014; (3) the dangerous nature of the instant offense; and (4) his veiled threats to "confront" the

two Bowlin's employees for "ruining [his] life" and to find the federal magistrate judge in the District of Arizona who detained him and "go to his house."

      In sum, Defendant's history and characteristics show that he is a flight risk and a serious danger to the community—and that no conditions will reasonably assure his appearance at future court proceedings or the safety of the community.

## VII. CONCLUSION

      Defendant must be detained pending trial because there is no set of conditions that will reasonably assure the safety of the community or his appearance as required.  The United States therefore respectfully requests that the Court deny Defendant's motion (Doc. 51).

Respectfully Submitted,

RYAN ELLISON
Acting United States Attorney

RICHARD C. WILLIAMS
GRANT B. GARDNER
Assistant U.S. Attorneys
200 N. Church Street
Las Cruces, NM 88001
(575) 522-2304

I HEREBY CERTIFY that I
electronically filed the foregoing using
the CM/ECF system which will send notification to
defense counsel of record by electronic means.

***Electronically Filed on 11/12/2025***
GRANT B. GARDNER
Assistant United States Attorney