IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                     No. 2:25-cr-02558-SMD

GREGORY VANDENBERG,

       Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Defendant's First Motion in Limine (Doc. 67), which seeks to exclude proposed expert witness testimony by FBI Agent Marchand Thomas MacDermotRoe. The Court held a hearing on the motion to exclude Agent MacDermotRoe on December 1, 2025, and December 3, 2025. On December 1, 2025, the government advised that it intended to withdraw certain proffered opinion evidence, sought to qualify Agent MacDermotRoe as an expert on "antisemitic and Islamic extremism symbols," and would limit his testimony to identifying and contextualizing certain exhibits. Having considered the briefing, the parties' arguments at hearing, the relevant law, and being otherwise fully advised, the motion is granted in part.

## I.      Background

The Superseding Indictment, filed on November 18, 2025, charges Defendant Gregory Vandenberg with: (1) transportation or receipt, in interstate or foreign commerce, of explosives with knowledge and intent that the explosives be used to kill, injure, or intimidate an individual, in violation of 18 U.S.C. § 844(d); and (2) attempted transportation of fireworks into the State of

California, knowing such fireworks were to be possessed, distributed, and otherwise dealt with in a manner and for a use prohibited by the laws of California, in violation of 18 U.S.C. § 836. Doc. 71. The challenged expert testimony discussed herein is proposed as relevant to the felony transportation of explosives charge in Count 1. Trial is set for January 5, 2026.

The factual allegations in this case are that on June 12, 2025, Defendant purchased fireworks from a store on Interstate 10, near Lordsburg, New Mexico, as he was traveling west from El Paso, Texas; and, as to the § 844(d) violation, that while Defendant was purchasing these fireworks, he made statements to store personnel indicating his intent to take the fireworks to the upcoming anti-Trump ("No Kings") protests in California and throw the fireworks at law enforcement officers. Defendant denies the allegation that he made the statements and that he was going to California. Proof of Defendant's intent is a key issue.

## II.    FBI Agent Marchand Thomas MacDermotRoe

The United States noticed its intent to call Federal Bureau of Investigations Special Agent Marchand MacDermotRoe as an expert on "antisemitic and Islamic extremism symbols," as clarified at the December 1, 2025 hearing. *See* Doc. 58; Doc. 80.

Agent MacDermotRoe is a member of the FBI's Joint Terrorism Task Force and has worked with the El Paso, Texas, field office for approximately two years. Prior to the El Paso field office, he worked with the resident agency in Las Cruces. He currently works in counterintelligence and international terrorism. His most recent case involves cybercrime, working with circumnavigating VPNs, but his prior work includes interviewing migrants with "special interests," which Agent MacDermotRoe defined as originating "from countries where terrorist organizations may be active."

Prior to joining the FBI, Agent MacDermotRoe served in the United States Army Reserve. He was deployed twice—first to Afghanistan for approximately eight months in 2013–2014 and second to Kuwait and Bahrain for approximately eight months in 2017–2018.  He described "extensive conversations" with "at least 20, 30" members of the Taliban while stationed at what was then Camp Sabalu-Harrison in Afghanistan.  During his second deployment to Kuwait and Bahrain, his work involved customs and clearing equipment coming back into the United States from the central command.  However, Agent MacDermotRoe described "spend[ing] my evenings walking around town and getting to speak to people on the street" which allowed him "to understand not just the dynamics, but also exposed me to understanding the Shia perspective when it came to Islamic extremism."  Most recently, between April 2022 and March 2023, Agent MacDermotRoe worked as a watch commander at Guantanamo Bay, where he was responsible for guarding a senior member of Al-Qaeda.

Outside of his work experience, Agent MacDermotRoe described his personal study of Islamic extremism as a "20-year mission."  Agent MacDermotRoe majored in history at New Mexico State University, but did not complete any courses on religious extremism as part of his studies.  He testified that he was "impacted by September 11th . . . which led to [him] studying Islam, [] embracing Islam for about ten years, [] reading the philosophers of Islamic extremism, and specifically Sunni Islam extremism [and] branch[ing] to also studying Shia Islamic extremism as well."  He further credits his participation in the Muslim Students Association at Manhattanville College, and the six or seven months he spent in Helwan, Egypt, for his understanding of different religious and political perspectives.

### III.    Agent MacDermotRoe's Proposed Testimony

The government noticed Agent MacDermotRoe as its proposed expert on Islamic extremism.  Doc. 58.  According to the Rule 16 notice, Agent MacDermotRoe reviewed items of evidence, including (1) a t-shirt and a hat that were found in Defendant's vehicle, both of which contain what appears to be the flag of Al-Qaeda; (2) an English version of the Quran that was found in his vehicle; and (3) various items on Defendant's phone.  He was initially expected to testify "as to the meaning and significance of some of these items of evidence" and potentially to "further testify that these items of evidence are consistent with Defendant (1) having an anti-U.S. government knowledge, motive, and intent—particularly as he was travelling with fireworks to the anti-government 'No Kings' day protests in San Diego, California, which were scheduled for June 14, 2025;1 and/or (2) being in the process of becoming radicalized with a violent Islamic fundamentalist ideology that is opposed to the U.S. government."  *Id.* at 2.

The government further clarified the scope of Agent MacDermotRoe's anticipated testimony in its response to the Defendant's motion in limine:

1. The antisemitic and anti-Israel t-shirts that Defendant possessed—including the antisemitic "AMALEK" t-shirt that he openly wore in public as he entered Bowlin's on June 12, 2025, to purchase fireworks. *See* Gov't Ex. 1 at 1–2.

2. The antisemitic, anti-Israel, and anti-Trump items on Defendant's phone, including:

   a. Defendant's subscription to a "Jews Are The Devil" text feed;

   b. an "Israel's Archenemy – Amalek" image from 4/30/25;

   c. an image on 5/24/25, stating "K*ll Donald Trump";

   d. a video, which Defendant shared with a friend on May 24, 2025, showing President Donald Trump, in a dubbed-over voice, stating "May Allah awaken the people and help them see the evil doings of Israel and the United States."

4

   e. a video, which Defendant shared with a friend on May 27, 2025, showing President Donald Trump as a dog on a leash who is being walked by an Israeli and showing the flag of Israel on the White House.

   f. a "Fuck Israel" image from 6/1/25;

   g. an image of an Israeli flag burning on 6/9/25;

   h. an image on 6/9/25, suggesting an "Insurrection!" against Trump; and

   i. internet searches for "nuke israel" and "nuke israel t-shirt" at approximately 10:30 p.m. on 6/12/25 (several hours after Defendant bought the fireworks and about five hours before he was arrested). *See, e.g.*, *id.* at 3–19.

3. The pro-Al-Qaeda and pro-Taliban items found in Defendant's car and on his phone— further evidencing Defendant's antisemitic and anti-Israel motivation; such evidence includes:

   a. the Al-Qaeda hat and t-shirt found in Defendant's car (along with the Quran and kufis);

   b. the Taliban flag on the home screen of Defendant's phone;

   c. an internet search on 6/2/25 for "taliban flag order";

   d. images of the Taliban and Al-Qaeda flag on Defendant's phone;

   e. items suggesting an obsession with violence and misogyny—both hallmarks of Islamic extremism—including videos of a young child decapitating a teddy bear in front of an ISIS flag and then chanting "Allāhu ʾAkbar," a live beheading of an adult female, a young man being burned to death, and a Mexican beauty influencer being executed during one of her live TikTok streams. *See, e.g.*, id. at 20–34.

4. Expert testimony by FBI Special Agent MacDermotRoe regarding "the meaning and significance of some of [the above-listed] items of evidence." Doc. 58 (Notice of Expert Witness Testimony) at 2. Such expert testimony will provide the following:

   a. Explanation of Evidence. The "AMALEK" statement on the t-shirt that Defendant wore in public on June 12, 2025, when he entered Bowlin's is an antisemitic reference, as it refers to the historical enemy of the Jewish people. In addition, the "LEG-X-FRET" statement and logo immediately below the AMALEK statement refers to "Legio X Fretensis"—a Roman "legion [that] was sent to suppress the Jewish rebellion in Judea that occurred after the death of King Herod the Great in 4 CE."

   b. Explanation of Evidence. The t-shirt with the USS Liberty on it in Defendant's vehicle refers to an incident during the 1967 Six-Day War

when the Israeli Air Force mistakenly attacked a U.S. Navy vessel. This incident is frequently cited by antisemitic individuals who believe that Israel intentionally attacked the ship—but was not punished because the Jewish lobby controls the United States.

c.  Explanation of Evidence. The t-shirt with the "IVDEA delenda est" phrase contains an antisemitic message ("Judea must be destroyed").

d.  Explanation of Evidence. A hat and t-shirt found in Defendant's vehicle both contain a picture of the Al-Qaeda flag. The home screen of Defendant's phone displays a picture of the Taliban flag. Defendant's phone contains additional images of Al-Qaeda and Taliban flags.

e.  Opinion Evidence. The evidence listed above in 1–3 is "consistent with Defendant having an anti-U.S. government [and more specifically, an anti-Israel, anti-Trump, pro-extremist] knowledge, motive, and intent" as he was traveling to the No Kings protests with fireworks. Doc. 58 at 2.

f.  Opinion Evidence. The evidence listed above in 1–3 is consistent with Defendant "being in the process of becoming radicalized with a violent Islamic fundamentalist ideology that is opposed to the U.S. government [and hence to Trump]." Id.

See Doc. 80 at 3–5.

On December 1, 2025, the government advised that it would withdraw the "opinion evidence" referenced in subparagraphs 4e and 4f. The government proposed to introduce Agent MacDermotRoe as an expert on "antisemitic and Islamic extremism symbols" and intended to limit Agent MacDermotRoe's testimony to identifying and contextualizing the exhibits described in paragraphs 1–4d. Because the Court has excluded and the government has withdrawn several exhibits since December 1, 2025, this Order discusses the categories of proposed "identification and explanation" evidence addressed during the hearing on Defendant's motion to exclude.

**a.  Agent MacDermotRoe May Offer Testimony to Identify Taliban, Al-Qaeda, and ISIS Flags.**

The government seeks to offer testimony from Agent MacDermotRoe regarding several items found in Defendant's vehicle and images extracted from Defendant's phone, including an

"Al-Qaeda hat and t-shirt," the "Taliban flag on the home screen of Defendant's phone," "images of the Taliban and Al-Qaeda flags," and a still image from a video featuring the ISIS flag. For the reasons below, Agent MacDermotRoe may testify to identify certain flags that appear on items of clothing found in Defendant's vehicle or in the materials downloaded from Defendant's phone. However, Agent MacDermotRoe need not be qualified as an expert on Islamic extremism to provide this identification testimony.

Lay witnesses can offer testimony rationally based on their perceptions, but not an opinion "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). Rule 701 permits the admission of lay opinion testimony provided that it meets two criteria: a rational basis in perception and helpfulness to the jury. *United States v. Contreras*, 536 F.3d 1167, 1170 (10th Cir. 2008). When addressing the admissibility of lay identification testimony, courts have been liberal in determining the extent of perception required to satisfy the first requirement of Rule 701. For example, a lay witness may identify a defendant from surveillance footage based on prior familiarity with the defendant's appearance, or provide voice identification of an alias based on the witness's recognition of the defendant's voice. *E.g.*, *Contreras*, 536 F.3d at 1169; *United States v. Bush*, 405 F.3d 909, 915–16 (10th Cir. 2005); *see also United States v. Hall*, 20 F.4th 1085, 1101 (6th Cir. 2022) (detective could testify as lay witness to identify voice of coconspirator in defendant's jail calls). In each instance, the jury had *some* ability to identify the defendant without the lay opinion testimony. In *Contreras*, for example, the jurors could review surveillance footage of a bank robbery and determine whether the defendant was the robber based on his appearance in courtroom. 536 F.3d at 1170. In *Bush*, the jury heard an audio recording of the defendant's voice and could compare it to recordings featuring the voice of his alleged alias. 405 F.3d at 917. The Tenth Circuit nevertheless held that

the challenged lay witness was in a better position to make an identification based on prior familiarity. *See Contreras*, 536 F.3d at 1171 (probation officer met with defendant "between five and ten minutes" on multiple occasions and developed "more sophisticated mental picture of [defendant's] appearance"); *Bush*, 405 F.3d at 918 (noting detective's three prior face-to-face conversations with defendant).

Courts have allowed lay witnesses to offer "observations that are common enough and require a limited amount of expertise, if any." *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1214 (10th Cir. 2011). In *United States v. Freeman*, the Ninth Circuit held that a case agent permissibly testified as a lay witness to his understanding of ambiguous phrases used during the defendant's intercepted calls. 498 F.3d 893, 904–05 (9th Cir. 2007). Although the case agent was not a participant in the conversations he interpreted, his understanding of ambiguous phrases was based on his direct perception of several hours of intercepted conversations. *Id.* at 905; *see also United States v. Awan*, 966 F.2d 1415, 1430–31 (11th Cir. 1992) (undercover agent permissibly testified as lay witness to interpret code words where meaning of words was not perfectly clear without agent's explanations).

<u>Taliban Flag</u>

Agent MacDermotRoe may testify as a lay witness to identify the Taliban flag, provided that proper foundation for the exhibit is laid during trial. For example, Exhibit 71 depicts the home screen of Defendant's phone as it was found in his vehicle. The screen shows black Arabic calligraphy on a white background. Agent MacDermotRoe identified the script as a portion of the Shahada—or profession of faith—and that the black script on a white background is specifically associated with the Taliban, and now the Islamic Emirate of Afghanistan. Agent MacDermotRoe testified that he has encountered the Taliban flag "hundreds of times" in his professional work

8

between his time in the military and the FBI, and described the flag as a "common banner" among detainees in Afghanistan, and "once [he] got in with the FBI," "especially with the fall of Kabul."

While jurors may have some ability to identify the cropped image featured in Exhibit 71 as the flag of the Taliban, Agent MacDermotRoe's prior opportunity to see the flag in different contexts provides some basis for concluding that he is more likely to identify the flag correctly than is the jury. *See Contreras*, 536 F.3d at 1170. The Court notes however, that if an exhibit features what appears to be a modified Taliban flag—as in Exhibit 128, which features a flag with additional Arabic script along the bottom—Agent MacDermotRoe may not speculate as to the meaning of the flag as modified unless he has prior knowledge of the specific flag featured in the exhibit. Agent MacDermotRoe's lay identification testimony is only helpful to the jury to the extent that he is more likely to identify the flag correctly as a result of his prior familiarity with symbols associated with the Taliban.

<u>Al-Qaeda Flag</u>

Similarly, Agent MacDermotRoe may testify as a lay witness to identify the Al-Qaeda flag. He testified that he had "seen it hundreds of times" and described it as a symbol he "saw very regularly," both in his training in the military and since beginning to work at the FBI. Agent MacDermotRoe testified that the Al-Qaeda flag also featured the profession of faith, in the same style of calligraphy used on the flag of the Taliban, and that white calligraphy on a black background is consistent with the Al-Qaeda flags he had seen.

ISIS Flag

Agent MacDermotRoe may testify as a lay witness to identify the ISIS flag.[1]   Agent MacDermotRoe testified that the ISIS flag consisted of the profession of faith along the top and the Seal of Muhammad in the center.  He described the Seal of Muhammad in the center as "very distinct to the ISIS flag" and stated that he had not seen that version of the seal on "any other flags belonging to other terroristic organizations."  The flag is "a very, very common symbol" that he has seen in his casework, including his work with individuals who have pledged allegiance to ISIS.

**b.  Agent MacDermotRoe Does Not Have Expert Knowledge of Antisemitic Symbols, Antisemitic Ideology, or Anti-Israel Sentiments.**

The government seeks to have Agent MacDermotRoe opine on numerous exhibits containing alleged antisemitic symbols.  The government does not argue that Agent MacDermotRoe's professional work focuses on antisemitism, that he has received training or specialized education in antisemitism, or that he has pursued extensive self-study in Jewish history and antisemitic propaganda.  The government instead seems to imply that because some Islamic extremist groups espouse antisemitic ideologies, and Agent MacDermotRoe is acquainted with certain branches of Islamic extremism, he possesses expert knowledge of antisemitic symbols. The Court will not sustain such strained inferences.  Agent MacDermotRoe is not testifying as an expert in Islamic extremism and, even if he were, that designation would not qualify him as an expert in antisemitism.  *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) ("An expert's testimony must be "within the reasonable confines of her subject area.").  At most, Agent MacDermotRoe's study and experiences with Islamic extremism may have given him

---

[1] The Court previously excluded Exhibit 105—the only identified exhibit depicting the ISIS flag—in the format used in the government's Second Amended List.  Agent MacDermotRoe may identify the ISIS flag provided it appears in an otherwise admissible exhibit.

"some marginal familiarity with general concepts" of antisemitism.  *Id.*  Accordingly, the government must establish an independent basis for Agent MacDermotRoe's expertise in antisemitism and antisemitic symbology.  The government also groups its anti-Israel exhibits with its antisemitic exhibits.  The Court does not find these areas of knowledge to be coextensive.  To the extent the government seeks to introduce exhibits of anti-Israel content, it must demonstrate why those fall within Agent MacDermotRoe's ken.  *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009); *Lippe v. Howard*, 287 F. Supp. 3d 1271, 1279 (W.D. Okla. 2018) ("[T]he qualifications of a proposed expert must be assessed only after the specific matters he proposes to address have been identified.").  The government has failed to meet its burden for either topic.  *See* Fed. R. Evid. 702.

The Court begins with the finding that Agent MacDermotRoe's firsthand conversations with individuals in Afghanistan, Kuwait, Bahrain, and Guantanamo do not qualify him to testify on antisemitic symbology.  The insights Agent MacDermotRoe shared at both hearings revealed several troubling inconsistencies between his methodology and his conclusions.  *Dodge v. Cotter*, 328 F.3d 1212, 1222 (10th Cir. 2003).  The government submitted that Agent MacDermotRoe was responsible for supervising 180 detainees in Afghanistan, "the vast majority of whom were members of the Taliban" and that he conducted "extensive interviews with several dozen Taliban prisoners."  Doc. 58 at 1.  Agent MacDermotRoe's testimony contradicted those representations.  First, he clarified that there were approximately 20 to 30 Taliban members in his housing unit, not a "vast majority."  Second, contrary to the government's characterization, these conversations hewed more closely to casual exchanges than "extensive interviews."  Agent MacDermotRoe never used a standardized set of questions in his conversations with detainees.  He spoke about "whatever came up."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151 (1999) (expert's

testimony unreliable "where the discipline itself lack reliability").  In Kuwait, his conversations arose from his "evenings walking around town and getting to speak to people on the street."  *Cf. United States v. Medina-Copete*, 757 F.3d 1092, 1102 (10th Cir. 2014).  Although Agent MacDermotRoe resisted the distinction between "firsthand research" and "self-study" as "semantics," he offered no countervailing testimony to prove that his conversations were intellectually rigorous.  *Kumho*, 526 U.S. at 152.

The factual circumstances of these interactions further undermine their credibility. For one, Agent MacDermotRoe's information comes from a skewed and unverified sample, namely detained prisoners and random passersby.  *Medina-Copete*, 757 F.3d at 1102; *Jinro Am. Inc. v. Secure Investments, Inc.*, 266 F.3d 993, 1006 (9th Cir. 2001).  There is no way of confirming that these individuals were Muslim nor that they were extremists.  Agent MacDermotRoe also does not speak Arabic.  Save his conversations with the Taliban fighters, he conducted all of his conversations with Afghan detainees through an interpreter.  Whether the information relayed to him was accurate or not, it is now outdated.  Agent MacDermotRoe served in Afghanistan over a decade ago; his second deployment to Kuwait and Bahrain was over seven years ago.  The ideologies of Islamic extremist groups have shifted and evolved since then.  Agent MacDermotRoe acknowledged this, noting that the United States is no longer the myopic focus of organization in Afghanistan and that the definition of extremist was itself open to debate.  Ultimately, Agent MacDermotRoe provided scant evidence of who he spoke with, what they talked about, or how those conversations relate to the present case.

Agent MacDermotRoe's conclusions about the relationship between Islamic extremism and antisemitism also give the Court great pause. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993).  Though courts focus more closely on a proposed expert's

methodologies than their conclusions, "an expert's conclusions are not immune from scrutiny.'" *Dodge*, 318 F.3d at 1222 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Many of Agent MacDermotRoe's statements exhibit a monolithic view of Islamic extremist organizations derived from his anecdotal conversations that took place years ago and supplemental readings, rather than professional experience or academic study. For instance, at one point, the government asked Agent MacDermotRoe to identify "some patterns or things that we see [] in Islamic extremism based on your studies and conversations." Agent MacDermotRoe replied that there is "a common pattern of anti-Western, antisemitism, you often see an element of misogyny involved." He then asserted that these groups share the view that "Jews are inherently trying to undermine the virtues of Islam" and that this belief "is a pattern you see between all—or a common theme you see between all Islamic extremist groups." But as the Tenth Circuit has explained, "[m]ere observation that a correlation exists—especially when the observer is a law enforcement officer likely to encounter a biased sample—does not meaningfully assist the jury in determining guilty or innocence." *Medina-Copete*, 757 F.3d at 1102. The gap between Agent MacDermotRoe's sources—detained individuals and random passersby with unspecified ideologies—and his conclusion—that all Islamic extremist groups believe Jewish people are undermining Islam—is "simply too great" to be considered reliable. *Joiner*, 522 U.S. at 146.

The Court is particularly unwilling to classify vague statements of this sort as expert testimony where they collapse multiple religious groups and their attendant philosophies into a singular narrative. *Medina-Copete*, 757 F.3d at 1108–09; *Jinro*, 266 F.3d at 1006. Courts have excluded testimony where a witness's relevant experience with a culture and its customs is rooted in mere personal interest. *See, e.g.*, *Medina-Copete*, 757 F.3d at 1104 (reversing admission of expert testimony on the connection between a religious icon and drug trafficking where witness

13

was a "cultural hobbyist" who had visited several shrines of patron saints); *Jinro*, 266 F.3d at 1001 (reversing admission of expert testimony on "Korean law and the business practices of Korean companies" where witness's expert was grounded in his "hobby of studying Korean business practices, unspecified input from his office staff, and his marriage to a Korean woman"); *United States v. Urie*, 183 F. App'x 608, 609 (9th Cir. 2006) (affirming exclusion of witness whose qualifications as an expert in Nigerian culture were "the fact that he grew up in Nigeria and claimed to be 'intimately familiar with Nigerian culture'").  Agent MacDermotRoe's testimony mirrors that offered in *Jinro*, *Medina-Copete*, and *Urie*; he made "sweeping generalizations" based on his "limited experience and knowledge" and "generalized, anecdotal references to his personal experience."  *Jinro*, 266 F.3d at 1006.  Agent MacDermotRoe "has no education or training" on antisemitism, is not "a trained sociologist or anthropologist," and lacks pertinent background that would enable him to "provide reliable information about the cultural traits and behavior patterns of a particular group of people of a given ethnicity or nationality."  *Id.*  And, most notably, the government has failed to elucidate how interacting with purported Islamic extremists in Afghanistan, Kuwait, and Bahrain would expose Agent MacDermotRoe to antisemitic symbology found in the United States.  *Joiner*, 522 U.S. at 146; *Medina-Copete*, 757 F.3d at 1102.

What remains of Agent MacDermotRoe's education and study on antisemitism amounts to a handful of scattered readings and courses: he took a class on the Holocaust during his undergraduate studies, he read a book on the French Revolution, and he studied the Torah.  None of these experiences demonstrate that Agent MacDermotRoe can provide "relevant and reliable knowledge" of antisemitism and antisemitic symbology.  *Ralston*, 275 F.3d at 969.  Regarding exhibits that contain images of the Israeli flag or other Israel content, Agent MacDermotRoe is likewise unqualified to testify as an expert.  The government made no effort to establish an

independent basis for Agent MacDermotRoe's knowledge of Israel and his credentials do not evince any expertise in the area. The Court rejects the implication that knowledge of Israel should be assumed given his time in the Middle East and his ability to identify a handful of flags. The scope of Agent MacDermotRoe's testimony on Israel is restricted to, as a lay person, identifying the Israeli flag (*e.g.*, Ex. 77). In sum, the Court finds that Agent MacDermotRoe lacks sufficient skill, experience, or knowledge in antisemitism, antisemitic symbology, and anti-Israel sentiments to be certified as an expert under Rule 702. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004). The Court will now outline which portions of the proffered exhibits on antisemitism and antisemitic symbology Agent MacDermotRoe may testify to as a lay witness.

<u>Judea Must Be Destroyed (Ex. 58)</u>

Agent MacDermotRoe may read the Latin phrased emblazoned on the t-shirt shown in Exhibit 58 and state its meaning in English. However, Agent MacDermotRoe cannot provide any testimony on the phrase, including its historical context, modern political usage, or how it may be interpreted by members of the Jewish community. Agent MacDermotRoe stated that the phrase is very common, but that he has not seen it in his counterterrorism work; his knowledge of its meaning and history stems from a book he read for the French Revolution course he enrolled in at NMSU, as well as some additional self-study. Prior to the undergraduate class, he had only seen it appear in the context of Roman history. He is therefore limited to translating Exhibit 58.

<u>USS Liberty (Ex. 59)</u>

None of Agent MacDermotRoe's testimony offers a reliable foundation for the testimony he offered regarding the USS Liberty. Agent MacDermotRoe stated that he was familiar with the antisemitic use of the USS Liberty among conspiracy theorists. Agent MacDermotRoe does not encounter this image in professional duties. He did not state how he otherwise became familiar

with conspiracy theorists use of the image, but did share that he had, many years ago, read a book authored by a crewmember from the USS Liberty. Reading a singular narrative account is not equivalent to expert knowledge. *Cf. United States v. Maryboy*, 628 F. Supp. 3d 1112, 1119 (D. Utah 2022) ("Even if he has read studies on the four core areas, being "well read" on these topics is not enough to qualify him as an expert); *Hernandez v. City of Albuquerque*, No. CIV 02-0333 JB/RHS, 2004 WL 5522847, at *4 (D.N.M. Jan. 23, 2004). Agent MacDermotRoe is therefore barred from testifying to Exhibit 59.

Trump at the Western Wall (Ex. 84)

Agent MacDermotRoe is not permitted to testify as to Exhibit 84. His understanding for part of the image displayed in Exhibit 84 originates from the Holocaust course he completed during his undergraduate studies. As has already been established, that education is an insufficient foundation for expert testimony under Rule 702. The remainder of Exhibit 84 comes within the knowledge of a layperson and does not require expert testimony.

May Allah Awaken (Ex. 93)

Agent MacDermotRoe's testimony regarding Exhibit 93 conflated anti-Israel sentiment with antisemitism, anti-US ideology, and Islamic extremism without explanation. In discussing a video of President Trump captioned "May Allah open up the eyes of the American people to the evils of Israel in the United States," Agent MacDermotRoe explained that this demonstrated an "antisemitic and anti-US bend." Agent MacDermotRoe did not elaborate on, nor did the government put forth any evidence establishing, his familiarity with anti-Israel sentiments. There is no foundation for Agent MacDermotRoe's conclusion that political opposition to Israel necessarily conveys an antisemitic or anti-US conviction. Moreover, Exhibit 93 (save for the word "Allah," which is written in Arabic) is in English. "[W]here expert testimony is offered on an issue

16

that a jury is capable of assessing for itself, it is plainly within the trial court's discretion to rule that testimony inadmissible because it would not even marginally assist the trier of fact." *Sanderson v. Wyo. Highway Patrol*, 976 F.3d 1164, 1173 (10th Cir. 2020). Once the word "Allah" is translated, the jury can read Exhibit 59 and independently evaluate what the statement conveys. Agent MacDermotRoe's testimony regarding Exhibit 93 is accordingly limited to translation of the Arabic script for the word "Allah."

### "Fuck Israel" Image (Ex. 96)

Exhibit 96 displays a red triangle overlaid on text that reads "Fuck Israel." During the second hearing, Agent MacDermotRoe only spoke to the red triangle, noting that Nazis would have forced political prisoners in concentration camps to wear this symbol. He acknowledged that it was worn by both Jewish and non-Jewish individuals. Like Exhibit 84, his foundation for this knowledge is the Holocaust course he took as an undergraduate student. Agent MacDermotRoe has not seen this symbolism in his professional life. Agent MacDermotRoe did not offer any testimony regarding the "Fuck Israel" message seen behind the red triangle and has not established that he has specialized knowledge of Israel. Agent MacDermotRoe may read the text of Exhibit 96; he is not qualified to testify as an expert as to any other part of Exhibit 96.

### Amalek (Exs. 97, 100, 246)

Agent MacDermotRoe is not qualified to testify about the meaning of Amalek. Agent MacDermotRoe testified that his knowledge of Amalek's meaning comes from his reading of the Torah and personal experience with the Jewish community and culture. He also testified, without much specificity, that Amalek has appeared in his self-study. His testimony regarding Amalek is unmoored from his experience as an FBI agent, his time serving in the military, and any formal academic education he has received. *Medina-Copete*, 757 F.3d at 1103–04; *United States v.*

*Holmes*, 751 F.3d 846, 854–55 (8th Cir. 2014) (Kelly, J. concurring) (distinguishing experience gained through professional experience from knowledge gained through self-study and observations).  Agent MacDermotRoe is prohibited from testifying to the meaning of the word "Amalek," including its appearance in Exhibits 97, 100, and 246.

### c.  MacDermotRoe Cannot Offer Testimony Regarding the Caucasian Front Symbol.

The government seeks to introduce Agent MacDermotRoe's testimony regarding hats and T-shirts bearing a symbol allegedly associated with the Caucasian Front.  At the December 1, 2025 hearing, Agent MacDermotRoe identified the symbol as "the crest of the Caucasian Front of Chechnya."  He explained that the Caucasian Front was an Islamic rebel group that opposed the Russian occupation of Chechnya.  He further testified that the flag "normally" associated with the Caucasian Front is the flag of the Republic of Ichkeria, but the exhibits in this case display the different Chechen Republic flag.  Although Agent MacDermotRoe admitted that he cannot explain why a different version of the flag appears, he stated that the black oval is consistent with the Caucasian Front's established iconography.   Finally, Agent MacDermotRoe described the Caucasian Front as an "Islamic extremist group" that later evolved into the Caucasian Emirate, which eventually joined ISIS.

When asked whether the Caucasian Front and its black oval symbol were antisemitic, Agent MacDermotRoe conceded that the group was "predominantly anti-Russian" but nevertheless suggested that antisemitism "would have been central to [the Caucasian Front's] ideology" based on his assumption that Islamic extremist groups are generally antisemitic.

Rule 702 requires that expert testimony be grounded in specialized knowledge, skill, experience, training, or education, and that the expert reliably apply such knowledge to the facts in a manner helpful to the jury.  Fed. R. Evid. 702; *Medina-Copete*, 757 F.3d at 1101.

Agent MacDermotRoe's current role as an FBI agent assigned to the Joint Terrorism Task Forces and his prior overseas assignments at Guantanamo Bay and Afghanistan give him some background in identifying flags used by Islamic extremist groups. *See* Doc. 58 at 1, 3. That background, however, does not meet Rule 702's requirement for a reliable foundation to testify about the Caucasian Front symbol. *See Ralston*, 275 F.3d at 970. When questioned about his professional exposure to the symbol, Agent MacDermotRoe attributed that general familiarity to his FBI work and recounted interactions in Afghanistan with a detained Chechen national. According to Agent MacDermotRoe, he observed the symbol on artwork kept by the Chechen individual. That experience, however, is likewise insufficient to support expert testimony. A witness "relying solely or primarily on experience" must "explain how the experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Fredette*, 315 F.3d 1235, 1240 (10th Cir. 2003). Here, Agent MacDermotRoe's asserted personal knowledge or experience is limited to interaction with one Chechen national, who is not alleged to have any affiliation with the Caucasian Front organization. That anecdotal encounter does not provide a reliable basis for identifying or interpreting the symbol.

An expert may testify only within the bounds of his specialized knowledge, and Agent MacDermotRoe acknowledged that he is unfamiliar with this specific variation of the emblem. *See* Fed. R. Evid. 702. His inability to clarify the variation's relationship to the commonly recognized Caucasian Front iconography prevents him from offering any reliable opinion regarding the emblem's historical context and underlying ideology.

Moreover, Agent MacDermotRoe suggested that the Caucasian Front later dissolved and joined ISIS, thereby implying an ideological alignment. The government's questioning of Agent

MacDermotRoe appeared to rest on the premise that because the Caucasian Front was an Islamic extremist organization—and because certain Islamic extremist ideologies are antisemitic—the black circle on this emblem should be viewed as an antisemitic symbol. That reasoning risks going beyond the evidence and invites improper inferential leaps.

To avoid unsupported inferences, the Court holds that Agent MacDermotRoe may not testify regarding this symbol or the Caucasian Front, nor offer any opinion on the group's antisemitic implications, its association with ISIS, or the beliefs and intent of the individual possessing the item. His admitted uncertainty concerning this version of the symbol prevents him from providing reliable assistance to the jury on this point.

### d. MacDermotRoe Cannot Testify on the "Neo-Nazi Symbol" Because He Lacks the Requisite Expertise.

The government also seeks to elicit expert testimony from Agent MacDermotRoe regarding an image containing a black circular ring bordered by a snake and enclosing a rune-like figure. The Court concludes that Agent MacDermotRoe is not qualified to offer any testimony on this symbol and that all testimonies related to neo-Nazism must be excluded.

Agent MacDermotRoe expressly testified that he is not an expert in neo-Nazi ideology or symbols. He further stated that he does not know the meaning of the snake motif or the interior rune-like symbol and cannot identify whether this composite design is used by any neo-Nazi or antisemitic organization. These admissions foreclose any finding that he possesses the specialized knowledge Rule 702 requires.

Agent MacDermotRoe testified that he only recognizes the ring-shaped element of the emblem, which by itself can be referred to as a "black sun wheel" or "schwarze sonne," and that this component is associated with certain white supremacist and neo-Nazi groups because of its

historical use by the SS.  He made clear, however, that he does not recognize the composite design and cannot identify the meaning or significance of the snake border, the interior figure, or how those elements function together.  Because he knows only one isolated part of the image, he cannot say that the emblem as a whole is a black sun wheel or explain the significance of the full design. Because he lacks knowledge regarding every other component of the design and disclaims expertise in neo-Nazism, Rule 702 bars him from offering expert testimony on this emblem or any neo-Nazi associations.

## IV.    Conclusion

IT IS ORDERED that Defendant's First Motion in Limine (Doc. 67) is granted in part. Agent MacDermotRoe is precluded from testifying as an expert on "antisemitic and Islamic extremism symbols," as clarified at the December 1, 2025 hearing, but may testify as a lay witness as set forth in this Order.

_____
**SARAH M. DAVENPORT**
**UNITED STATES DISTRICT JUDGE**